UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

In Re:                                    )    CASE NO: 08-01151-dd
                                          )
JOHN G. CALHOUN                           )    CHAPTER 7
GLENDA R. CALHOUN                         )
                    Debtors.              )
                                          )

_____

**DEBTORS' OBJECTION TO MOTION TO DISMISS
COMBINED WITH MEMORANDUM
AND REQUEST TO BE HEARD**

The debtors, by counsel, hereby object to and request to be heard on the United States Trustee's Motion To Dismiss. In opposition to the Motion To Dismiss filed by the United States Trustee ("UST"), the debtors show this Court:

**I. Statement of Applicable Statute and Rules**.

The debtors agree with the statement of the applicable Bankruptcy Code sections set forth by the UST but disagree that the result is dismissal of this Chapter 7 case.

**A. Timeliness of the Motion**.

The debtors agree that the motion was timely filed.

**B. Statement of Facts**.

The UST accurately summarizes the contents of the schedules filed by the debtors, with few exceptions. The motion makes repeated reference to John Calhoun's Social Security income and

the debtors contend that Congress determined that Social
Security income should be excluded from calculation of ability
to pay. The debtors anticipate filing a statement of undisputed
facts to be agreed upon with the UST prior to trial of this
matter. The debtors dispute the conclusion that the case should
be dismissed.

## II. Argument And Citation of Authority

The substance of the argument by the UST is that the
debtors have a high income, should consider "some belt
tightening" (Motion, p.3), have the ability to repay their
creditors and filed in bad faith.  For the reasons that follow
and for the reasons to be presented at trial, the debtors
contend that the allegations of the UST should not result in
dismissal of this case.

## A. The debtors' expenses are reasonable using the standards set by Congress.

Congress determined that eligibility to obtain a discharge
under Chapter 7 would hinge upon means testing, embodied in Form
B22A.  Form B22A filed in this case reflects that the debtors do
not have sufficient income to require dismissal of this case.
The debtors contend that Form B22A as filed with the petition
correctly calculates the income and expenses of the debtors as
required by Congress.   Form B22A filed with the petition
correctly results in no presumption of abuse.   The UST has

neither challenged the results of Form B22A nor the figures contained in Form B22A.

**B. The debtors filed in good faith.**

The Schedules filed in this case reflect honest, yet unfortunate debtors who do not have the ability to pay their debts. John Calhoun is 64 years old and receives a fixed monthly pension and Social Security. Glenda Calhoun is 57 years old and has no income. The expenditures listed by the debtors are reasonable and do not indicate bad faith. Prior to filing this case the debtors made substantial efforts to repay their creditors directly and through a debt management plan and resorted to filing this case as a last resort.

**1. The debtors' housing expenditures are reasonable.**

The UST argues that the housing expenditures are excessive. The debtors have lived their residence in Jackson, South Carolina for approximately 27 years. The debtors have attached Exhibit A, incorporated by this reference, detailing the history of the home and the debtors' efforts regarding home expenses. In 2000 the debtors attempted to sell the home after their oldest child finished high school. During the two years that the property was for sale only three potential buyers looked at the property and the debtors received no offers. In 2003 the debtors realized that they would not be able to sell the property and that they would stay in the property as their

retirement home.   They then renovated portions of the home, included making the master bedroom accessible to account for any infirmities later in life.   The debtors closed the swimming pool in 2005.   The tennis courts have been playable for only three of the 27 years and are not playable at this time.   The payments for the two mortgages total $2,151.00 per month.   This amount is consistent with Internal Revenue Service, Census and Bureau of Labor standards and does not reflect an excessive percentage of the debtors' household income.

**2. The debtors' food expenditures are reasonable.**

The UST argues that food expenses are excessive. While the amount budgeted for food may exceed the amount deemed reasonable by the UST, the amount is not excessive.   The debtors monitor their grocery spending and keep close tabs on the budget. Attached as Exhibit B, and incorporated by this reference, is a narrative provided by the debtors regarding their food expenses. The narrative provides further details as to the steps taken to maintain a reasonable budget while attempting to repay creditors.

**3. The debtors made substantial adjustments to their living expenses and the current living expenditures are reasonable.**

In addition to the steps taken regarding the home and the food budget, the debtors substantially reduced other expenses.

Attached as Exhibit C, and incorporated by this reference, is a list of 28 steps taken by the debtors to reduce expenditures. The debtors calculated that these 28 steps would reduce expenditures by $1,744.00 per month.  In addition to the 28 items on the attachment, the debtors also cancelled their vehicle On-Star service ($18.00 per month) and reduced their auto insurance premium ($131.00 per month).  These belt tightening steps reduced expenditures by $1,893.00 per month. The debtors believed that these steps would permit them to successfully complete a debt management plan to repay their creditors.

The debtors discovered that the debt management plan left no funds for health emergencies and no allowance for unexpected expenses.  The debt management plan took so much of the debtor's income that a portion of their residence has been without heating and air-conditioning since July 2007 and plumbing repairs could only be afforded by using funds set aside for taxes.

The debtors finally ceased making the payments into the debt management plan not long before filing this case.  Review of the attached Exhibit C confirms that the debtors have already attempted what the UST suggests and reflects that these debtors are not able to pay their creditors.

## C. The *Green* factors suggest that the debtors filed in good faith.

The totality of the circumstances indicates that the debtors have filed in good faith. In determining good faith, the Court must look at the facts in each case. In re Thomas, 325 B.R. 751, 757, (Bankr.D.S.C. 2006).  The Court in In re Green, 934 F.2d 568, 572 (4th Cir. 1991), suggests that the true purpose of the inquiry is to prevent "abuse of the process by a debtor seeking to take **unfair advantage** of his creditors." (emphasis added).

The debtors have not taken advantage of their creditors. The debtors' history with their creditors suggests that the debtors did all that they could to repay the unsecured debts. Prior to entering a debt management plan the debtors contacted Wachovia, Citi Cards and Bank of America in an attempt to restructure their obligations.  Each company refused, citing that the debtors were current in monthly payments.  Each company suggested that the debtors become three months delinquent and then call back.  The debtors have not acted unfairly as to their creditors.

Attached as Exhibit D, and incorporated by this reference, is a summary provided by the debtors reflecting the interest rate changes and the monthly payments for the debtors' major unsecured obligations.  When the interest rates increased, the

debtors had not fallen behind on payments and John Calhoun still had a credit score of 700, indicating that the change in interest rates was not related to any conduct of the debtors.

As the Exhibit suggests, the increased interest rates coupled with increased minimum payment requirements resulted in the debtors not being able to meet the monthly obligations. The debtors' unsecured debts have existed for many years and only became unmanageable after interest rate increases and minimum payment increases.

The debtors have not used the credit cards in a number of years and entered a debt management program in 2006.  The debtors reasonably believed that their retirement savings would allow them to meet obligations to creditors and meet living expenses. Unfortunately, the debtors' retirement funds decreased dramatically, leaving the debtors only with Mr. Calhoun's fixed pension and Social Security.

### D.   The ability to pay is insufficient to determine abuse.

The Amendments to the Bankruptcy Code in 2005 changed the terminology from "substantial abuse" to "abuse" and put into place means testing.  Although the Green case pre-dates these amendments, the fundamental principles outlined in Green are sound.  The Court in Green determined that ability to pay did not alone constitute substantial abuse.  The logic of Green still applies even if the 2005 Amendments eroded a portion of

the foundation upon which Green was based. The UST argues that
Green should be rejected to the extent that it holds that
ability to pay alone is not sufficient to constitute abuse.
This Court in In re Wolfe, C/A No. 07-06119-dd, slip op. at 10
(Bankr.D.S.C. 05/16/08), expressly refused to decide whether
ability to pay is sufficient to constitute abuse.  In Wolfe, the
Court determined that the debtor filed in bad faith and
determined that the totality of the circumstances weighed
against the debtor and did not reach the question of ability to
pay.  Wolfe is distinguishable from this case. John and Glenda
Calhoun filed in good faith and do not have the ability to pay
their creditors.

## III. Conclusion

The Court should deny the motion of the UST because the
presumption of abuse does not arise and because the totality of
the circumstances does not warrant dismissal.  The debtors filed
in good faith after a substantial effort to reduce expenses and
pay creditors.  The schedules filed by the debtors are accurate.

Wherefore, the debtors respectfully request this Court to
conduct a hearing and thereafter to deny the relief sought by
the UST.  If the Court is inclined to dismiss the case then the
debtors respectfully request a period of time to consider

conversion to Chapter 13 between entry of the Order and dismissal of the case.

Respectfully submitted.

/s/ Joseph E. Mitchell, III
Joseph E. Mitchell, III
District Court ID No. 6115
Attorney for the Debtors

Joseph E. Mitchell, III, P.C.
Post Office Box 2504
Augusta, GA 30903
(706) 826-1808

# EXHIBIT A

NARRATIVE ON PROPERTY LOCATED
AT
208 TENNIS RANCH ROAD
JACKSON, SC

The Calhouns purchased the above listed property in July of 1981. The property at that time consisted of a brick ranch style house, formerly known as the Tennis Ranch, built in either 1968 or 69 and approximately ten cleared, grassy acres of land.  The house has been our primary and only residence for the last 27 years.  There have been no second homes, RVs, campers or time-shared vacation properties purchased/owned in either of our adult lives.  Improvements, updates and additions have been made to the property over this 27-year time span.

Once the last of our four children graduated from high school in 2000, we put the property on the market for a two-year period with the intent of our buying a home with less demanding maintenance/upkeep. During that time it was first listed with real estate agent, Mary Miano of Aiken's Southern Traditions Real Estate Co., then for sale by owner for a significant portion of the period and finally with Betty Bearden of Meybohm Reality in North Augusta.  During the two-year time period, only 3 potential buyers came to view the property with none of the three being brought by the realtors.

When the property did not sell, we took steps in 2003 to update, remodel and add on a handicap accessible master suite to accommodate any old age needs.  We sold off the adjoining approximate 7 acres with the barn.  It was our intent to remodel with that revenue & our investment money and settle into our existing home as a final retirement property.  Our investments went south during the remodel endeavor, and we were forced to pay for the completion with our retirement savings. This left us scrambling for refinancing our altered piece of property.  We did not see our final house payments of $2,151.00 as an excessive portion of our monthly income at the time.

For ease of maintaining the remaining property and cutting expenses, we closed the swimming pool in 2005 and filled it in the summer of 2007.  We attempted to plant part of the property away from the house in pine trees, which would eventually eliminate some of the grass mowing. (Many of the pine trees died and would require replanting in order to achieve that benefit.)  The tennis courts have never been removed over our years of ownership due to the enormous expense

required to do so.  In 1994, they were economically resurfaced as one of our sons played tennis for Silver Bluff High School.  The "inherited" tennis courts have been unplayable for all but about 3 of the 27 years we've lived at this location.  We are not, nor have ever been, a tennis-playing family.

In early 2006, prior to entering the Clearpoint payment plan, we tried to refinance our mortgage to see if any equity could be pulled out and applied to our existing debt (converting consumer debt into mortgage debt).  When contacting the appraiser that had appraised the property for the 2003 financing, she said the property would not appraise for $300,000.00 as there were no comps available in this unincorporated, predominately rural area.

As far as we can determine, we are stuck in our present location, having no monies for even routine maintenance and upkeep available, with foreclosure being the only other option available to us at this point.  The back part of the house has been without heating and air since July of 2007.  Plumbing problems in October 2007 required 3 months of our saved property tax money.

# EXHIBIT B

# FOOD BUDGET FOR THE CALHOUNS

There have been questions raised regarding our household food budget and expenses, which we would like to address here.

The food budget was derived directly from grocery store and fast food receipts. We paid close attention to these before entering into the Clearpoint payment plan in order to catch any leaks and curtail excessive household spending. This monitoring, by the way, led to significant cutting of fast food pick-ups and all but completely shut down eating in sit-down restaurants of any nature.

We do buy Bi-Lo & Publix specials and use their store coupons but do not drive to several different grocery stores in search of specials. We buy most all of our operating household budget items at the grocery stores.

For years, when our children were growing up, I printed menus and accompanying grocery lists for each week. From the beginning of John's retirement in 1997, I began to wane from that practice but returned to it in 2006 in order to more closely monitor food expenditures while in the Clearpoint repayment plan. I have those menus available.

Periodically we host an adult Bible Study in our home for 13 to 18 people. We provide desserts and drinks when hosting that.

We pick up and keep one of our grandchildren every day after school and have her some summer days while her daddy works. She frequently eats with us during the week since her daddy usually works till between 6:45 and 7:30p.m.

Occasionally our younger son eats with us.

We contribute food to our birthday/holiday family gatherings of 13 people.

We take food to monthly church fellowships if possible.

We make food, only rarely, for bereaved families in our church.

When two of our grandsons are with us, we provide them with a special Fiengold Stage One & some Stage Two foods. These organic specialty foods are more expensive than average, and many are only obtainable at Earth Fare or Whole Foods stores.

We do not consume or cook with beer or wine; so these items are never purchased. Cigarettes for Glenda are included in the grocery budget.

Other than a habit of possibly preparing too much food per meal, I do not see further ways to cut our food budget.

# EXHIBIT C

## "BELT TIGHTENING" ALREADY DONE

Most of these measures were taken before entering the Clearpoint payment plan. Some were done afterwards.

1. Turned in leased Ford 150 truck at end of lease and attempted to make do with one vehicle.
2. Turned in Cadillac STS at end of lease and leased a 2007 Honda Accord for better gas mileage, cheaper operating expense.
3. Quit operating 26 yr. old swimming pool in 2005.
4. Caved in & covered over swimming pool (dangerous mosquito breeding hole) in 2007.
5. Tennis courts shown in arial view of property have not been playable since 1997.
6. Have paid for no vacations or travel since 2004.
7. Gave up cell phone expenses.
8. Curtailed driving, limiting only to church, school pickup of our granddaughter, Health Central, grocery store and the Beech Island Dollar General.
9. Reduced clothing budget significantly.

10. Glenda quit Health Central gym payments and trips to gym. (John did not as exercise is vital to his diabetic condition.)
11. Glenda ceased buying supplemental vitamins such as Flaxseed Oil, B12, multi vitamin, Vitamin E, Glucosamine, etc.
12. Saved money buying all prescription meds at University Hospital pharmacy instead of drug stores.
13. We cut our own hair – no trips to hairdressers or barbers.
14. Monitor electrical and water usage.
15. Ceased newspaper and magazine subscriptions. (recently reinstated *Augusta Chronicle* with an offer of $29.00 for entire year but shall not resubscribe at any higher rate)
16. Closely monitored food budget and attempted to cut wherever possible.

17. Switched telephone service from AT&T to the cheaper Comcast communication package.

18. Discontinued buying all gifts, including Christmas and birthday gifts for our children and grandchildren, wedding & shower gifts.

19. Decline social invitations that require purchases or money input on our part.

20. Do not host or co-host birthday, bridal or baby showers for friends or neighbors.

21. No flower budget for funerals since 2005.

22. Ceased charitable giving outside regular 10% tithe to church & occasional special love offerings.

23. Requested our children give us toiletries, gas/gift cards and household cleaning products as birthday & Christmas gifts to help defer those routine expenses.

24. Shop for our clothing only at Discount stores such as Hamricks, Ross and T.J. Maxx, Walmart & K-mart.

25. Buy as much as possible cheaply at Dollar Stores in Beech Island before going to the grocery store.

26. No recreational/entertainment monies whatsoever are spent.

27. Limit visits to out-of-town relatives.

28. John drives a 1995 Ford 150 truck in sad shape. Money not available for any repairs should vehicle die.

# EXHIBIT D

WACHOVIA-1760
ACCOUNT OPENED
MARCH     OF 1987

| STATEMENT DATE | BEGINNING BALANCE | INTEREST CHARGED | PAYMENTS POSTED | CHGS POSTED | ENDING BALANCE | INTEREST RATE |
|---|---|---|---|---|---|---|
| 01/24/2005 | $12,276.01 | $ 59.64 | $ 56.92 | $ - | $ 12,278.73 | 5.75% |
| 02/21/2005 | $12,278.73 | $ 53.90 | $ 59.64 | $ - | $ 12,272.99 | 5.75% |
| 03/24/2005 | $12,272.99 | $ 62.26 | $ 53.90 | $ 50.00 | $ 12,331.35 | 6.00% |
| 04/23/2005 | $12,331.35 | $ 62.77 | $ 112.26 | $ - | $ 12,281.86 | 6.25% |
| 05/24/2005 | $12,281.86 | $ 64.86 | $ 62.77 | $ - | $ 12,283.95 | 6.25% |
| 06/24/2005 | $12,283.95 | $ 67.42 | $ 64.86 | $ - | $ 12,286.51 | 6.50% |
| 07/26/2005 | $12,286.51 | $ 69.60 | $ 67.47 | $ - | $ 12,288.64 | 6.50% |
| 08/25/2005 | $12,288.64 | $ 67.78 | $ 69.50 | $ - | $ 12,286.92 | 6.75% |
| 09/26/2005 | $12,286.92 | $ 74.88 | $ 67.78 | \0 | $ 12,294.02 | 7.00% |
| 10/25/2005 | $12,294.02 | $ 70.37 | $ 74.95 | $ - | $ 12,289.44 | 7.25% |
| 11/23/2005 | $12,289.44 | $ 70.37 | $ 70.37 | $ - | $ 12,289.44 | 7.25% |
| 12/26/2005 | $12,289.44 | $ 82.82 | $ 70.37 | $ - | $ 12,301.89 | 7.50% |
| 01/25/2006 | $12,301.89 | $ 77.82 | $ - | $ - | $ 12,379.71 | 7.75% |
| 02/23/2006 | $12,379.71 | $ 75.23 | $ 82.82 | $ 4.14 | $ 12,376.26 | 7.75% |
| TOTAL | | $ 959.72 | $ 913.61 | $ 54.14 | | |

| | |
|---|---|
| BEGINNING BALANCE 1/24/05 | $12,276.01 |
| INTEREST CHARGED | $ 959.72 |
| CHARGES POSTED | $ 54.14 |
| PAYMENTS POSTED | $ 913.61 |
| ENDING BALANCE 2/23/06 | $12,376.26 |

CITIBANK-5397
ACCOUNT OPENED
October 1984

| STATEMENT DATE | BEGINNING BALANCE | INTEREST CHARGES | PAYMENTS POSTED | CHGS POSTED | ENDING BALANCE | INTEREST RATE |
|---|---|---|---|---|---|---|
| 1/14/2005 | $9,893.80 | $230.02 | $254.23 | | $9,868.89 | 29.24% |
| 2/14/1995 | $9,868.89 | $239.18 | $235.02 | | $9,873.05 | 29.49% |
| 3/16/2005 | $9,873.05 | $231.16 | $244.18 | | $9,860.03 | 29.49% |
| 4/15/2005 | $9,860.03 | $228.14 | $236.16 | | $9,852.01 | 29.49% |
| 5/13/2005 | $9,852.01 | $237.46 | | $39.00 | $10,128.47 | 29.99% |
| 6/15/2005 | $10,128.47 | $267.60 | $643.07 | | $9,753.00 | 29.99% |
| 7/15/2005 | $9,753.00 | $245.78 | $272.60 | $192.34 | $9,918.52 | 30.24% |
| 8/15/2005 | $9,918.52 | $260.90 | | $85.69 | $10,265.11 | 30.49% |
| 9/15/2005 | $10,265.11 | $260.76 | $555.68 | | $9,970.19 | 30.49% |
| 10/14/2005 | $9,970.19 | $244.16 | $265.76 | | $9,948.59 | 30.74% |
| 11/14/2005 | $9,948.59 | $262.64 | $249.16 | | $9,962.07 | 30.99% |
| 12/15/2005 | $9,962.07 | $263.28 | $267.64 | | $9,957.71 | 30.99% |
| 1/16/2006 | $9,957.71 | $274.52 | $362.28 | $39.00 | $9,908.95 | 31.24% |
| 2/14/2006 | $9,908.95 | $248.06 | $412.52 | | $9,744.49 | 31.49% |
| 3/16/2006 | $9,744.49 | $256.37 | $345.06 | $133.60 | $9,789.40 | 31.49% |
| TOTAL | | $3,750.03 | $4,343.36 | $488.93 | | |

BEGINNING BALANCE 1/14/05      $9,893.80

INTEREST CHARGED      $3,750.03

CHARGES POSTED      $488.93

PAYMENTS POSTED      $4,343.36

ENDING BALANCE 3/16/06      $9,789.40

BANK OF AMERICA-4412
ACCOUNT OPENED MARCH 1995

| STATEMENT DATE | BEGINNING BALANCE | INTEREST CHARGED | PAYMENTS POSTED | CHGS POSTED | ENDING BALANCE | INTEREST RATE |
|---|---|---|---|---|---|---|
| 03/10/2005 | $5,792.76 | $ 84.82 | $ 217.53 | $ 162.27 | $ 5,822.32 | 19.99% |
| 04/10/2005 | 5,822.32 | $ 101.54 | $ 94.82 | $ 162.27 | $ 5,991.31 | 21.74% |
| 05/10/2005 | 5,991.31 | $ 149.44 | $ 202.85 | $ 162.27 | $ 6,100.17 | 29.74% |
| 06/10/2005 | 6,100.17 | $ 157.00 | $ 359.61 | $ 162.27 | $ 6,059.83 | 29.99% |
| 07/10/2005 | 6,059.83 | $ 149.57 | $ 326.83 | | $ 5,882.57 | 29.99% |
| 08/10/2005 | 5,882.57 | $ 151.79 | $ 159.57 | | $ 5,874.79 | 30.24% |
| 09/10/2005 | 5,874.79 | $ 153.62 | $ 161.79 | $ 39.00 | $ 5,905.62 | 30.49% |
| 10/10/2005 | 5,905.62 | $ 149.68 | $ 202.62 | | $ 5,852.68 | 30.74% |
| 11/10/2005 | 5,852.68 | $ 153.41 | $ 159.68 | | $ 5,846.41 | 30.74% |
| 12/10/2005 | 5,846.41 | $ 149.53 | $ 163.41 | | $ 5,832.53 | 30.99% |
| 01/10/2006 | 5,832.53 | $ 167.42 | $ 206.36 | $ 124.00 | $ 5,917.59 | 31.24% |
| 02/10/2006 | 5,917.59 | $ 157.31 | $ 253.64 | | $ 5,821.26 | 31.24% |
| 03/10/2006 | 5,821.26 | $ 140.26 | $ 213.95 | | $ 5,747.57 | 31.49% |
| | | $ 1,865.39 | $ 2,722.66 | $ 812.08 | | |

| | |
|---|---|
| BEGINNING BALANCE 3/10/05 | $ 5,792.76 |
| INTEREST CHARGED | $ 1,865.39 |
| CHARGES POSTED | $  812.08 |
| PAYMENTS POSTED | $ 2,722.66 |
| ENDING BALANCE 3/10/06 | $ 5,747.57 |

CHASE-4482
ACCOUNT OPENED
June 2004

| STATEMENT DATE | BEGINNING BALANCE | INTEREST CHARGES | PAYMENTS POSTED | CHGS POSTED | ENDING BALANCE | INTEREST RATE |
|---|---|---|---|---|---|---|
| 7/20/2005 | $8,986.23 | $91.27 | $179.00 | $39.00 | $8,937.50 | 13.24% |
| 8/21/2005 | $8,937.50 | $106.55 | $178.00 | $95.95 | $8,962.00 | 13.49% |
| 9/21/2005 | $8,962.00 | $102.46 | $179.00 | $76.06 | $8,961.52 | 13.49% |
| 10/21/2005 | $8,961.52 | $101.49 | $179.00 | $75.27 | $8,959.38 | 13.79% |
| 11/21/2005 | $8,959.38 | $106.29 | $179.00 | $137.14 | $9,023.81 | 13.99% |
| 12/21/2005 | $9,023.81 | $105.10 | $208.81 | $87.11 | $9,007.21 | 14.24% |
| 1/21/2006 | $9,007.21 | $230.60 | $187.21 | $0.00 | $9,050.60 | 29.99% |
| 2/21/2006 | $9,050.60 | $234.54 | $0.00 | $74.00 | $9,359.14 | 29.99% |
| 3/21/2006 | $9,359.14 | $208.85 | $1,000.14 | $0.00 | $8,567.85 | 29.99% |
| TOTAL | | $1,287.15 | $2,290.16 | $584.63 | | |

| | |
|---|---|
| BEGINNING BALANCE 7/20/05 | $8,986.23 |
| INTEREST CHARGED | $1,287.15 |
| CHARGES POSTED | $584.63 |
| PAYMENTS POSTED | $2,290.16 |
| ENDING BALANCE 3/21/06 | $8,567.85 |

WACHOVIA-9748
ACCOUNT OPENED
July 1984

| STATEMENT DATE | BEGINNING BALANCE | INTEREST CHARGES | PAYMENTS POSTED | CHGS POSTED | ENDING BALANCE | INTEREST RATE |
|---|---|---|---|---|---|---|
| 2/14/2005 | $14,653.65 | $189.56 | $294.00 | $0.00 | $14,549.21 | 24.98% |
| 3/16/2005 | $14,549.21 | $190.69 | $204.00 | $0.00 | $14,535.90 | 24.98% |
| 4/16/2005 | $14,535.90 | $309.89 | $205.00 | $39.00 | $14,679.79 | 24.98% |
| 5/17/2005 | $14,679.79 | $311.48 | $330.00 | $39.00 | $14,700.27 | 24.98% |
| 6/16/2005 | $14,700.27 | $301.65 | $330.00 | $39.00 | $14,710.92 | 24.98% |
| 7/16/2005 | $14,710.92 | $303.08 | $330.00 | $39.00 | $14,723.00 | 24.98% |
| 8/16/2005 | $14,723.00 | $316.04 | $0.00 | $78.00 | $15,117.04 | 24.98% |
| 9/16/2005 | $15,117.04 | $314.84 | $671.00 | $0.00 | $14,760.88 | 24.98% |
| 10/17/2005 | $14,760.88 | $313.46 | $329.00 | $0.00 | $14,745.34 | 24.98% |
| 11/15/2005 | $14,745.34 | $293.12 | $328.00 | $29.00 | $14,739.46 | 24.98% |
| 12/14/2005 | $14,739.46 | $293.31 | $331.00 | $0.00 | $14,701.77 | 24.98% |
| 1/17/2006 | $14,701.77 | $343.89 | $437.00 | $0.00 | $14,608.66 | 24.98% |
| 2/14/2006 | $14,608.66 | $282.62 | $0.00 | $39.00 | $14,930.28 | 24.98% |
| 3/16/2006 | $14,930.28 | $304.94 | $467.00 | $39.00 | $14,807.22 | 24.98% |
| TOTAL | | $4,068.57 | $4,256.00 | $341.00 | | |

| | |
|---|---|
| BEGINNING BALANCE 2/14/05 | $14,653.65 |
| INTEREST CHARGED | $4,068.57 |
| CHARGES POSTED | $341.00 |
| PAYMENTS POSTED | $4,256.00 |
| ENDING BALANCE 3/16/06 | $14,807.22 |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In Re: | ) CASE NO: 08-01151-dd |
| JOHN G. CALHOUN | ) |
| GLENDA R. CALHOUN | ) CHAPTER 7 |
| Debtors. | ) |
| | ) |
| _____ | ) |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT I HAVE THIS DAY SERVED UPON THE FOLLOWING A COPY OF THE WITHIN AND FOREGOING DEBTORS' OBJECTION TO MOTION TO DISMISS COMBINED WITH MEMORANDUM AND REQUEST TO BE HEARD (WITH EXHIBITS) VIA ELECTRONIC TRANSMISSION.

Joseph F. Buzhardt, III, Esquire
United States Trustee


Robert F. Anderson, Esquire
Chapter 7 Trustee


Date: 06/12/08



/s/ Joseph E. Mitchell, III
Joseph E. Mitchell, III
District Court ID No. 6115
Attorney for the Debtors


Joseph E. Mitchell, III, P.C.
Post Office Box 2504
Augusta, GA 30903
(706) 826-1808